Filed 9/11/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE KENNEDY COMMISSION,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE OF CALIFORNIA ex rel. ROB BONTA, as Attorney General et al.<br><br>    Real Parties in Interest. | D085237<br><br>(San Diego County<br>Super. Ct. No. 30-2023-01312235-CU-WM-CJC) |
| THE PEOPLE OF CALIFORNIA ex rel. ROB BONTA, as Attorney General et al.<br><br>    Petitioners,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>CITY OF HUNTINGTON BEACH et al.<br><br>    Real Parties in Interest. | D085238<br><br>(San Diego County<br>Super. Ct. No. 30-2023-01312235-CU-WM-CJC) |

ORIGINAL PROCEEDINGS on petitions for writs of mandate. Katherine A. Bacal, Judge. Relief granted in part.

Rob Bonta, Attorney General, Daniel A. Olivas, Assistant Attorney General, David Pai, Thomas P. Kinzinger, and Matthew T. Struhar, Deputy Attorneys General, for Petitioners and Real Parties in Interest People of California ex rel. Rob Bonta, Attorney General, and California Department of Housing and Community Development.

Community Legal Aid SoCal, Sarah Reisman, Ryan M. Kendall; Public Law Center, Marc Callahan, Richard Walker, Hannah Poploskie; Crowell & Moring, Daniel A. Sasse, Danielle P. Richards, Kari G. Ferver; The Public Interest Law Project, Ugochi Anaebere-Nicholson, Craig Castellanet, Michael Rawson for Petitioner Kennedy Commission.

Michael J. Vigliotta, City Attorney; Kowal Law Group, Timothy M. Kowal, Teddy T. Davis, and Ryan Merker for Real Parties in Interest City of Huntington Beach, City Council of Huntington Beach, and Al Zelinka.

# I

# INTRODUCTION

The Legislature has declared housing availability to be of "vital statewide importance" and the "attainment of decent housing and a suitable living environment ... a priority of the highest order." (Gov. Code, § 65580, subd. (a).)[1] Consistent with this legislative declaration, the state's Housing Element Law (§§ 65580 to 65589.55) requires each local government to adopt a housing element as a component of its general plan and to periodically review and update the housing element. (§ 65588; see § 65302.)

---

[1] Undesignated statutory references are to the Government Code.

2

The City of Huntington Beach, a charter city, was required to approve its most recent housing element revision by October 15, 2021. At present, nearly four years after that deadline, the City has refused to adopt a revised housing element based on its stated concern that a revised housing element would harm the environment because it would force the City to plan for the construction of an excessively high number of affordable housing units.

Therefore, the People of California ex rel. Rob Bonta, Attorney General (the People), and the California Department of Housing and Community Development (the HCD; together with the People, the State) filed a petition for writ of mandate against the City of Huntington Beach, its City Council, and its City Manager, Al Zelinka (collectively, the City), seeking to compel the City to adopt a revised housing element. The Kennedy Commission intervened in the case and sought analogous writ relief.

The trial court granted the State's petition for writ of mandate. However, the court's order did not include two key features requested by the State in its writ petition: (1) a 120-day deadline for the City to bring its housing element into compliance (§ 65754, subd. (a)); and (2) one or more provisional remedies limiting the City's authority over permitting, zoning, and subdivision approvals until the City has adopted a substantially compliant housing element revision (§ 65755, subd. (a)). All parties appealed this order, which is the subject of a separate appeal pending before this court, Case No. D084749. After granting the State's petition for writ of mandate, the trial court stayed all further proceedings before it and declined to enter a final judgment based on the pendency of the appeal.

In these consolidated writ proceedings, the State and the Kennedy Commission (hereafter, the Petitioners) petition our court for a writ of mandate compelling the trial court to vacate the portion of its order declining

3

to impose a 120-day compliance deadline under section 65754, and one or more of the provisional remedies set forth in section 65755. They claim the trial court was required to include these provisions in its order granting the State's petition for writ of mandate and the court therefore erred when it omitted them from the order. The Petitioners also seek an order compelling the trial court to vacate its blanket stay of the proceedings before it and enter a final judgment in favor of the State.

We agree with the Petitioners that the trial court erred when it omitted the 120-day compliance deadline and one or more mandatory provisional remedies. We reach this determination because we are persuaded that Article 14 of Chapter 3 of Division 1 of Title 7 of the Government Code—the umbrella article containing sections 65754 and 65755—applies in legal enforcement actions challenging the housing elements of charter cities like the City. Thus, we grant the Petitioners' request for a peremptory writ directing the trial court to partially vacate the order granting the State's petition for writ of mandate, and we direct the court to enter a new order that satisfies sections 65754 and 65755.

Our decision today moots the parties' direct appeals of the order granting the State's petition for writ of mandate, which we dismiss by separate order entered in Case No. D084749. In light of that dismissal order, we instruct the trial court to lift its blanket stay of the proceedings before it.

Finally, we decline the Petitioners' request for writ relief instructing the trial court to enter a final judgment in favor of the State, as the trial court has not yet adjudicated the Kennedy Commission's pending petition in intervention or a pending cross-petition and complaint filed by the City against the State. However, we direct the court to afford the case the calendar preference to which it is entitled (see § 65752), and to expeditiously

4

adjudicate these pleadings.  The court's swift resolution of those pleadings should enable the court to enter a final judgment without delay.

## II

## BACKGROUND

### A. Statutory Framework

Each city and county in California is required to prepare and adopt a comprehensive, long-term general plan for the physical development of the locality.  (§ 65300.)  The general plan must include eight mandatory elements specified in Article 5 of the Planning Law: land use, housing, conservation, open space, circulation, noise, safety, and environmental justice.[2]  (§ 65302.)  The statutory obligation to adopt a general plan containing the necessary elements applies to general law cities and charter cities alike.[3]  (§ 65700, subd. (a).)  "Because of its broad scope, long-range perspective, and primacy over subsidiary land use decisions, the 'general plan has been aptly described as the "constitution for all future developments" within the city or county.' " (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th

---

[2]     The Planning Law constitutes Chapter 3 of Division 1 of Title 7 of the Government Code.  It consists of 24 articles encompassing sections 65100 to 65763.  Article 5 of the Planning Law is one of the 24 articles and it consists of sections 65300 to 65342.  Further undesignated references to Articles shall refer to the articles contained within the Planning Law.

[3]     "California law classifies cities as either charter cities, which are organized under a charter ([ ] § 34101), or general law cities, which are organized under the general law of the State of California ([ ] § 34102)." (*City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 251 (*City of Huntington Beach*).)  "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*City of Vista*).)

141, 152.) " ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." ' " (*Id.* at p. 153.)

Article 10.6, the Housing Element Law, sets forth the requirements of the housing element. It applies to both general law cities and charter cities. (§ 65700, subd. (b).) The housing element must include "an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (§ 65583.) It must "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Further, it must contain "[a]n assessment of housing needs and an inventory of resources and constraints that are relevant to the meeting of these needs." (*Id.*, subd. (a).) The assessment and inventory, in turn, must include "[a]n analysis of population and employment trends and documentation of projections and a quantification of the locality's existing and projected housing needs for all income levels," which includes "the locality's share of the regional housing need." (*Id.,* subd. (a)(1).) The locality's share of the regional housing need is determined through the regional housing needs assessment (RHNA) process.

The Legislature created the RHNA process "to address the state's shortage of affordable housing [citation]. To achieve the state's housing objectives, the law requires each local jurisdiction to zone adequate numbers of sites to accommodate the regional housing burden allocated to it, so that every local jurisdiction shares in the obligation to accommodate the statewide housing need. [Citations.] Various regional councils of governments, in conjunction with the cities and counties within their jurisdictions and the

6

…[]HCD[], devise methods for distributing existing and projected housing needs within their regions and for allocating a share of the regional housing needs to each local jurisdiction."[4] (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 610.) The Southern California Association of Governments (SCAG) is the regional council of governments encompassing the City.

"A municipality must review its housing element for the appropriateness of its housing goals, objectives, and policies and must revise the housing element in accordance with a statutory schedule." (*Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 222 (*Martinez*), citing § 65588, subds. (a), (b).) "The interval between the due dates for the revised housing element is referred to as a planning period or cycle, which usually is eight years." (*Martinez*, at p. 222.) "[T]he HCD's regional housing needs determination and the RHNA assigned to a locality by the regional council of governments are the centerpiece of a revised housing element's assessment of housing needs." (*Id.* at p. 223.)

The Housing Element Law also sets forth the procedures each local municipality must follow to revise the housing element of its general plan. "Before revising its housing element, [the] local government must make a draft available for public comment and, after comments are received, submit the draft, as revised to address the comments, to the [HCD]." (*Martinez,*

---

[4]    Specifically, the HCD determines the existing and projected housing needs for each region, in consultation with each regional council of governments. (§§ 65584, subds. (a)(1), (b), 65584.01.) Thereafter, each regional council of governments adopts a final regional housing need plan that allocates a share of the overall regional housing need to each city or county located within the region. (§§ 65584, subd. (b), 65584.04, 65584.05; see also *City of Irvine v. Southern California Assn. of Governments* (2009) 175 Cal.App.4th 506, 512–516 [summarizing the RHNA process].)

7

*supra*, 90 Cal.App.5th at p. 222, citing §§ 65585, subd. (b)(1), 65588.)  "After a draft is submitted, the HCD must review it, consider any written comments from any public agency, group, or person, and make written findings as to whether the draft substantially complies with the Housing Element Law." (*Martinez*, at p. 222, citing former § 65585, subds. (b)(3), (c), (d).)  "Those written findings must be reported to the local government within 90 days of HCD's receipt of the draft." (*Martinez*, at p. 222, citing former § 65585, subd. (b)(3).)

"If the HCD finds the draft does not substantially comply with the Housing Element Law, the local government must either (1) change the draft to substantially comply or (2) adopt the draft without changes along with a resolution containing findings that explain its belief that the draft substantially complies with the law." (*Martinez, supra*, 90 Cal.App.5th at p. 222, citing § 65585, subd. (f).)  "Promptly after adopting its revised housing element, the local government must submit a copy to the HCD." (*Martinez*, at p. 223, citing § 65585, subd. (g).)  "Within 90 days, the HCD shall review the adopted housing element and report its findings to the local government." (*Martinez*, at p. 223, citing § 65585, subd. (h).)  "If the HCD finds the housing element amendment substantially complies, the housing element enjoys a rebuttable presumption of validity." (*Martinez*, at p. 223, citing § 65589.3.) "If the HCD finds the adopted housing element does not substantially comply with the Housing Element Law, it 'shall notify' the local government and 'may notify the office of the Attorney General' that the local government is in violation of state law." (*Martinez*, at p. 223, citing § 65585, subd. (j).)

Under the Housing Element Law, the Attorney General may pursue an action or special proceeding against a city or county "relating to housing element compliance." (§ 65585, subd. (*l*).)  The Attorney General may

8

"request, upon a finding of the court that the housing element does not substantially comply with the requirements of [the Housing Element Law], that the court issue an order or judgment directing the jurisdiction to bring its housing element into substantial compliance with the requirements of" the Housing Element Law. (*Ibid*.) If the city or county does not comply within 12 months, the court "shall impose fines" on the city or county, which may increase in severity depending on the duration of the noncompliance. (*Id*., subd. (*l*)(1)–(3).) The Attorney General may also "seek all remedies available under law," and the court may "order remedies available pursuant to Section 564 of the Code of Civil Procedure, under which the agent of the court may take all governmental actions necessary to bring the jurisdiction's housing element into substantial compliance pursuant to [the Housing Element Law] in order to remedy identified deficiencies." (*Id*., subds. (*l*)(3)(B), (n).)

Article 14 (§§ 65750 to 65763) outlines the procedures governing legal challenges to general plans or elements thereof on the ground that they do not substantially comply with Article 5, which sets forth the substantive requirements of the general plan. Any such legal challenge must be brought as a traditional mandamus proceeding under section 1085 of the Code of Civil Procedure. (§ 65751.) A court must grant calendar preference to any legal action challenging a general plan and or element thereof. (§ 65752.) Further, if a petitioner requests a hearing or trial on its writ petition, the court must schedule the hearing or trial within 30 days and hold the hearing or trial within 120 days of the request. (§ 65753, subd. (b).)

Two additional provisions within Article 14 are of particular relevance to the present case. The first is section 65754. Subdivision (a) of that provision states, "In any action brought to challenge the validity of the

9

general plan of any city, county, or city and county, or any mandatory element thereof, if the court, in a final judgment in favor of the plaintiff or petitioner, finds that the general plan or any mandatory element of the general plan does not substantially comply with the requirements of Article 5," the city or county "shall bring its general plan or relevant mandatory element or elements thereof into compliance with the requirements of Article 5 … within 120 days." (§ 65754, subd. (a).) Subdivision (b) continues, "The city or county, including the chartered cities specified in subdivision (d) of Section 65860, shall, in accordance with Section 65860, bring its zoning ordinance into consistency with its general plan or relevant mandatory element or elements thereof within 120 days after the general plan has been amended in accordance with subdivision (a)." (*Id.*, subd. (b).)

The second relevant provision is section 65755. In part, it states, "The court shall include, in the order or judgment rendered pursuant to Section 65754, one or more of the following provisions … until the city, county, or city and county has substantially complied with the requirements of Article 5." (§ 65755, subd. (a).) Thereafter, it enumerates several provisional injunctive remedies and restrictions that apply to a city or county's authority over permitting, zoning, and subdivision approvals, which remain in place until the city or county has substantially complied with the requirements of Article 5.[5] (*Id.*, subd. (a)(1)–(6).)

---

[5]     Section 65755, subdivision (a), states, in full:
    "The court shall include, in the order or judgment rendered pursuant to Section 65754, one or more of the following provisions for any or all types or classes of developments or any or all geographic segments of the city, county, or city and county until the city, county, or city and county has substantially complied with the requirements of Article 5 (commencing with Section 65300):

10

(1) Suspend the authority of the city, county, or city and county pursuant to Division 13 (commencing with Section 17910) of the Health and Safety Code, to issue building permits, or any category of building permits, and all other related permits, except that the city, county, or city and county shall continue to function as an enforcement agency for review of permit applications for appropriate codes and standards compliance, prior to the issuance of building permits and other related permits for residential housing for that city, county, or city and county.

(2) Suspend the authority of the city, county, or city and county, pursuant to Chapter 4 (commencing with Section 65800) to grant any and all categories of zoning changes, variances, or both.

(3) Suspend the authority of the city, county, or city and county, pursuant to Division 2 (commencing with Section 66410), to grant subdivision map approvals for any and all categories of subdivision map approvals.

(4) Mandate the approval of all applications for building permits, or other related construction permits, for residential housing where a final subdivision map, parcel map, or plot plan has been approved for the project, where the approval will not impact on the ability of the city, county, or city and county to properly adopt and implement an adequate housing element, and where the permit application conforms to all code requirements and other applicable provisions of law except those zoning laws held to be invalid by the final court order, and changes to the zoning ordinances adopted after such final court order which were enacted for the purpose of preventing the construction of a specific residential development.

11

(5) Mandate the approval of any or all final subdivision maps for residential housing projects which have previously received a tentative map approval from the city, county, or city and county pursuant to Division 2 (commencing with Section 66410) when the final map conforms to the approved tentative map, the tentative map has not expired, and where approval will not impact on the ability of the city, county, or city and county to properly adopt and implement an adequate housing element.

(6) Mandate that notwithstanding the provisions of Sections 66473.5 and 66474, any tentative subdivision map for a residential housing project shall be approved if all of the following requirements are met:

(A) The approval of the map will not significantly impair the ability of the city, county, or city and county to adopt and implement those elements or portions thereof of the general plan which have been held to be inadequate.

(B) The map complies with all of the provisions of Division 2 (commencing with Section 66410), except those parts which would require disapproval of the project due to the inadequacy of the general plan.

(C) The approval of the map will not affect the ability of the city, county, or city and county to adopt and implement an adequate housing element.

(D) The map is consistent with the portions of the general plan not found inadequate and the proposed revisions, if applicable, to the part of the plan held inadequate."

12

## B. *The City Refuses to Adopt a Revised Housing Element*

The City is a charter city. By law, the City was required to update its sixth cycle housing element by October 15, 2021, the deadline for localities composing the SCAG to revise their housing elements.

The City submitted a draft sixth cycle housing element to the HCD for review on August 1, 2022, more than nine months after the deadline, and submitted revisions to the draft housing element on September 23. Pursuant to section 65585, the HCD notified the City that its draft housing element would substantially comply with the Housing Element Law once adopted by the City. Although the City obtained approval from the HCD for its draft housing element, the City did not adopt it.

Therefore, on February 22, 2023, the HCD sent a notice of violation to the City Council and City officials stating the City had violated its duty to update its sixth cycle housing element by October 15, 2021. Two weeks later, HCD and City staff met to discuss the alleged violation. Later that day, the City Manager sent a corrective action plan to the HCD, which proposed that the City Council would remedy the alleged violation by adopting the HCD-approved draft housing element at the next City Council meeting.

However, the next day, the City filed a federal lawsuit against the HCD and others in the Central District of California, Case No. 8:23-CV-00421, challenging the constitutionality of the Housing Element Law. The City Council also rejected the environmental impact report for the revised draft housing element revision at a subsequent City Council meeting, effectively rejecting the revision altogether. Councilmembers who opposed the revision expressed various reasons for their opposition, but primarily objected based on their stated belief that the City's share of the regional housing need had been improperly inflated and their prediction that additional affordable

13

housing units in the City would have detrimental impacts on the environment and the City's suburban character.[6]

C. *The Petition for Writ of Mandate and Stay*

On June 9, 2023, the State filed an amended petition for writ of mandate against the City in a lawsuit that was already pending in the Orange County Superior Court. The State alleged the City failed to adopt a compliant sixth cycle housing element by October 15, 2021, one of several unlawful tactics the City allegedly pursued to hinder the development of affordable housing within its borders. The first cause of action requested a writ of mandate ordering the City to comply with the Housing Element Law within 120 days by adopting a compliant sixth cycle housing element that met the City's share of the regional housing need. (See § 65754, subd. (a).) The second cause of action sought a judicial declaration that the City was not substantially compliant with the Housing Element Law.

On June 12, the State requested a hearing on the merits of its writ petition within 120 days pursuant to section 65753, subdivision (b).

On June 13, the City moved to stay the state action in its entirety pending the entry of a final judgment in the federal action.

On July 6, the state action was reassigned to the San Diego County Superior Court.

---

[6]    SCAG allocated 13,368 housing units to the City. The City appealed its RHNA allocation to SCAG's RHNA Appeals Board and requested a reduction in its allocation (see § 65584.05, subd. (b)), but the appeal was denied.

On September 5, the State moved for a preliminary injunction and temporary relief under sections 65753, subdivision (b), and 65757.[7]

On November 2, the trial court granted the City's motion to stay, freezing the state action in place pending entry of a final judgment in the federal action. When granting the stay, the court rejected the State's claim that a stay was improper because the case was entitled to calendar preference under section 65752. Relying on section 65700, which we will discuss below, the court reasoned that the calendar preference rule in section 65752 does not apply in legal enforcement actions filed against charter cities.

On November 13, the district court overseeing the federal action dismissed the City's case with prejudice. It dismissed the case after finding the City and its officers lacked Article III standing to assert federal constitutional challenges to state laws like the Housing Element Law.[8]

After the dismissal of the federal action, the Petitioners asked the trial court to lift its stay of the state action immediately. However, rather than lifting the stay, the court scheduled briefing and a hearing on the Petitioners' request, which the court later continued.

These delays prompted the State to seek extraordinary writ relief from this court, in *People of California, et al. v. Superior Court*, Case No. D083339.

---

[7]     Section 65757 states, in part, "During the pendency of any action described in Section 65754, the court may, upon a showing of probable success on the merits, grant the relief provided in Section 65755 as temporary relief."

[8]     On October 21, 2024, the Ninth Circuit Court of Appeals affirmed the district court's dismissal of the City's constitutional challenge to the Housing Element Law. (*City of Huntington Beach v. Newsom* (9th Cir. Oct. 30, 2024, No. 23-3694) 2024 U.S. App. Lexis 27528.)

We granted the request for relief and issued an alternative writ directing the trial court: (1) to vacate its stay order, enter a new order denying the stay, and schedule a hearing on the State's requests for temporary relief, a preliminary injunction, and a merits hearing; or (2) show cause why relief should not be granted. In granting the writ relief, we referenced prior judicial decisions suggesting that Article 14—which contains the calendar preference provision—applies to legal enforcement actions filed against charter cities.

### D. Proceedings After the Stay was Lifted

After we issued the alternative writ, the trial court lifted its stay, scheduled a hearing to address the State's request for temporary relief and a preliminary injunction, and set a hearing on the merits of the State's petition for writ of mandate. With the stay lifted, we discharged the alternative writ and dismissed the extraordinary writ petition as moot.[9]

On February 21, 2024, the day before the temporary relief and preliminary injunction hearing, the trial court authorized the Kennedy Commission—an advocate for affordable housing in Orange County—to intervene in the case. Like the State's writ petition, the Kennedy Commission's petition in intervention sought a writ of mandate compelling the City to comply with the Housing Element Law within 120 days by adopting a compliant sixth cycle housing element. It also sought a writ of mandate compelling the City to rezone sufficient sites to accommodate the City's RHNA for the sixth cycle.

---

[9]  The City later filed its own extraordinary writ petition asking us to reimpose the stay, which we denied. (*City of Huntington Beach v. Superior Court*, Case No. D083581.)

16

The court held a hearing on February 23, and granted, in part, the State's request for temporary relief and a preliminary injunction. Specifically, the court suspended the City's authority to approve new development on any RHNA site that would not satisfy the minimum density requirements of section 65583.2. (§ 65755, subd. (a)(1)–(3).) It also enjoined the City from enforcing planning and zoning laws to disapprove or reduce the density of any proposed housing development meeting the minimum density requirements of section 65583.2 on any RHNA sites.

The same day, the City filed an amended cross-petition for writ of mandate and complaint against the State, seeking to halt the State's enforcement action against the City. The cross-petition alleged: (1) the State did not provide the City with an opportunity to participate in two meetings concerning its housing element compliance, as required by section 65585, subdivision (k); (2) the remedies sought by the State were improper because Article 14 does not apply to charter cities; and (3) the City's adoption of a housing element satisfying its share of the regional housing need would run afoul of the California Environmental Quality Act (CEQA; Pub. Res. Code, § 21000 et seq.). The cross-petition sought to enjoin the State from pursuing its action against the City, dismissal of the writ proceeding, declaratory relief, and a writ of mandate ordering the HCD to certify a housing element that does not account for the City's regional housing needs allocation.

On February 26, the City answered the State's petition for writ of mandate. In its answer, the City asserted dozens of affirmative defenses, including defenses that substantively mirror the causes of action asserted in the City's cross-petition.

17

The State filed a demurrer and a special motion to strike the City's cross-petition under the anti-SLAPP law (Code Civ. Proc., § 425.16), both of which remain pending in the trial court.

*E. The Merits Hearing and Post-Hearing Developments*

On April 26, 2024, the trial court held a hearing on the State's petition for writ of mandate and, on May 15, the court issued a minute order granting the first cause of action for writ relief and denying the second cause of action for declaratory relief. The court found the State was entitled to a writ of mandate because the City had a ministerial duty to adopt a legally compliant sixth cycle housing element by October 15, 2021, which it breached by failing to adopt a sixth cycle housing element altogether.[10]

In granting the petition as to the first cause of action, the trial court rejected several of the City's defenses. It found: (1) the State satisfied its statutory duty to provide the City with an opportunity for two meetings to discuss the City's noncompliance; (2) the court was bound to follow our preliminary determination, rendered in the extraordinary writ proceeding, that Article 14 applies to legal actions against charter cities; (3) the Housing Element Law is sufficiently definite to survive a constitutional vagueness

---

[10] With respect to the second cause of action, the court ruled, "The [amended petition for writ of mandate] also alleges a cause of action for declaratory relief under [Code of Civil Procedure] section 1060. The [State] did not present any argument or authorities in support of its cause of action for declaratory relief. … It may be that the parties wanted to defer ruling on this cause of action. If not, the Court declines to exercise its declaratory relief power on the grounds that a declaration is not necessary under the circumstances. … [¶] ... [¶] [T]he People's first amended petition for writ of mandate and complaint is … DENIED in part as to the second cause of action for declaratory relief." After the court issued the minute order, the State requested a dismissal of its second cause of action for declaratory relief, which the court clerk entered.

18

challenge; (4) writ relief was warranted notwithstanding the City's then-pending appeal of the decision in the federal action; and (5) the City failed to establish that its adoption of a revised sixth cycle housing element would violate CEQA. The court ordered the City to "bring its housing element into substantial compliance with the Housing Element Law," and directed the State to prepare a proposed writ.

As instructed, the State submitted a proposed order granting its petition for writ of mandate. The proposed order included various provisions contemplated by Article 14. Specifically, it directed the City to bring its housing element into compliance with the Housing Element Law by adopting a substantially compliant sixth cycle housing element revision within 120 days under section 65754, subdivision (a). It also included several of the provisional relief provisions authorized by section 65755, subdivision (a).

On June 20, the court issued a final order granting the petition for writ of mandate (hereafter, the June 20 Order). The June 20 Order instructed the City to adopt a substantially compliant sixth cycle housing element; however, it excluded the 120-day compliance deadline envisioned by section 65754, subdivision (a). It also omitted the proposed provisional relief provisions under section 65755, subdivision (a). Further, the June 20 Order superseded, and thus terminated, the court's prior order granting the State's request for temporary relief and a preliminary injunction.[11]

---

[11] In a subsequent filing, the State asked the trial court to reinsert the provisions that were omitted from the June 20 Order, which the State theorized were inadvertent clerical errors. The court denied the request and indicated it had purposefully omitted the provisions for reasons that are not apparent from the appellate record.

The City appealed and the Petitioners cross appealed the June 20 Order. Those appeals are the subject of Case No. D084749.

On August 20, the State again asked the trial court to impose provisional relief under section 65755, subdivision (a). On September 24, the court denied the request and stayed all further proceedings under the automatic stay provisions of section 916 of the Code of Civil Procedure. The court reasoned the parties' appeals of the June 20 Order "act[ed] as a stay" of all lower court proceedings.

Thereafter, our court issued an order in Case No. D084749 concerning the appealability of the June 20 Order. We observed that the June 20 Order disposed of the State's request for a writ of mandate, but not the Kennedy Commission's petition in intervention or the City's cross-petition. Nonetheless, the State informed us the June 20 Order "effectively constitutes the final determination of the rights and obligations" of the parties and asked that we treat the June 20 Order as sufficiently final as to constitute an appealable judgment. Based on this representation, we directed the parties "to obtain a judgment reflecting the final adjudication of all the rights and obligations of the parties" and submit the judgment to us within 15 days.

In response, the State returned to the trial court and requested entry of a final judgment. On October 15, the court entered an order (hereafter, the October 15 Order) declining to enter a final judgment due to the pendency of the Kennedy Commission's petition in intervention and the City's cross-petition. The court also reimposed its stay of all trial court proceedings pending further order from our court.

On October 25, we issued an order in Case No. D084749, which allowed the appeal to proceed without prejudice to the filing of a formal writ petition.

20

Shortly after, the Petitioners filed the writ petitions at issue here. They seek a writ of mandate compelling the trial court to: (1) partially vacate the June 20 Order granting the writ of mandate as to the first cause of action; (2) vacate the October 15 Order staying the case; and (3) enter a final judgment that comports with Article 14, specifically the 120-day compliance deadline under section 65754, subdivision (a) and the provisional remedies authorized by section 65755, subdivision (a).

We consolidated the writ proceedings under Case No. D085237 and, for good cause shown, issued an order to show cause why the relief requested should not be granted.

The City filed a return and the Petitioners filed a consolidated reply.

III

DISCUSSION

A. *The Trial Court Erred By Omitting Article 14 Remedies from its Order*

The central issue in these consolidated writ proceedings is whether Article 14 applies to legal enforcement actions against charter cities. As noted, one provision contained within Article 14 requires a city or county to bring its general plan or mandatory element into compliance within 120 days of a court's finding that the general plan or mandatory element does not substantially comply with Article 5. (§ 65754, subd. (a).) Another provision from Article 14 requires a court, in any order or judgment finding that a city or county's general plan or mandatory element is not in substantial compliance with Article 5, to impose one or more permitting and development restrictions on the city or county until it has brought its general plan or element into substantial compliance with Article 5. (§ 65755, subd. (a).)

21

The Petitioners claim Article 14 applies to legal enforcement actions against charter cities and the trial court therefore erred when it declined to impose the 120-day compliance deadline and any provisional remedies in the June 20 Order. By contrast, the City argues these omissions were proper because Article 14 does not apply to charter cities. For reasons we shall explain, we agree with the Petitioners.

### 1. *Article 14 and Section 65700*

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin by examining the statutory language, giving it a plain and commonsense meaning.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14 (*Skidgel*).) Thus, in determining whether Article 14 applies to charter cities, we begin with an examination of the relevant statutory language—starting with the language of Article 14.

When we do so, we see that multiple provisions in Article 14 use broad and unqualified language suggesting they apply to *any* action challenging the validity of a general plan or element of *any* city—without differentiating between certain challenges involving general law cities and other challenges involving charter cities. Section 65754 applies to "*any action* brought to challenge the validity of the general plan of *any city*, county, or city and county, or any mandatory element thereof." (§ 65754, italics added; see § 65751 ["*Any action* to challenge a general plan or any element thereof on the grounds that such plan or element does not substantially comply with the requirements of Article 5 (commencing with Section 65300) shall be brought pursuant to Section 1085 of the Code of Civil Procedure."], italics added.)

" ' "[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' " ' [Citations.] Although not independently dispositive, '[u]se of the term "any" to modify the words [action and city] demonstrates the Legislature intended the law to have a broad sweep ….' " (*People v. Rhodius* (2025) 17 Cal.5th 1050, 1061; see *Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 256 ["the word 'any' connotes broad applicability"].) More specifically, the far-reaching language used in Article 14 suggests the article applies to charter and general law cities alike.

Even more telling, section 65754 presupposes that a judgment may be issued against a charter city under Article 14. Our discussion thus far has focused largely on section 65754, subdivision (a), which requires a city or county to bring its general plan or relevant mandatory element into compliance within 120 days of a finding the general plan or mandatory element does not substantially comply with Article 5. However, section 65754 also contains a second subdivision, subdivision (b), which requires a city or county to bring its zoning ordinance into consistency with the general plan or mandatory element within 120 days after an amendment of a general plan under subdivision (a). In part, subdivision (b), states, "[I]f the court, in a final judgment in favor of the plaintiff or petitioner, finds that the general plan or any mandatory element of the general plan does not substantially comply with the requirements of Article 5 (commencing with Section 65300): [¶] (b) The city or county, *including the chartered cities specified in subdivision (d) of Section 65860*, shall, in accordance with Section 65860, bring its zoning ordinance into consistency with its general plan or relevant mandatory element or elements thereof within 120 days after the general plan has been amended." (§ 65754, subd. (b) italics added.)

23

This explicit statutory reference to charter cities may be given full effect if Article 14 applies to charter cities, as the Petitioners contend. However, if Article 14 does not apply to charter cities, as the City claims, the statutory language at issue would seemingly be superfluous. "Interpretations that render statutory language meaningless are to be avoided." (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 386; see *In re C.H.* (2011) 53 Cal.4th 94, 103 ["It is a settled principle of statutory construction that courts should 'strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous.' "].)

The City does not devote much of its attention to the text of Article 14, but instead relies on section 65700—a provision codified outside of Article 14—to support its claim that Article 14 does not apply to charter cities. That statutory provision contains two subdivisions. Subdivision (a) states, "This chapter [Chapter 3 of Division 1 of Title 7] shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city and except that charter cities shall adopt general plans in any case. General plans of a charter city shall be adopted by resolution of the legislative body of the city, or the planning commission if the charter so provides. These general plans shall contain the mandatory elements required by Article 5 (commencing with Section 65300) of Chapter 3 of this title." (§ 65700, subd. (a).) Subdivision (b) provides exceptions to this general rule. It states, "Notwithstanding subdivision (a), paragraph (2) of subdivision (a) of Section 65400, Sections 65300.5, 65301.5, 65359, 65450, 65454, 65455, 65460.8, 65590, and 65590.1, and Article 10.6 (commencing with Section 65580) shall be applicable to charter cities." (§ 65700, subd. (b).)

Read together, these provisions provide that Chapter 3 of Division 1 of Title 7—the umbrella chapter containing Article 14—does not apply to charter cities, *except that*: (1) "charter cities shall adopt general plans" that "contain the mandatory elements required by Article 5" (§ 65700, subd. (a)); and (2) one article (Article 10.6) and 11 sections or subsections within Chapter 3 *do apply* to charter cities. The City argues that Article 14 does not apply to charter cities because section 65700 does not expressly exclude Article 14 from its general rule of inapplicability.

The Petitioners propose a different reading of section 65700. They note that section 65700 expressly mandates that charter cities "shall adopt general plans," and "[t]hese general plans shall contain the mandatory elements required by Article 5 …." (§ 65700, subd. (a).) They further observe that Article 14 merely outlines the procedures and remedies that apply in legal actions challenging a city or county's compliance with its obligation to adopt a general plan with the mandatory elements, including a compliant housing element.[12] According to the Petitioners, section 65700 can reasonably be interpreted as mandating that a charter city adopt a general plan containing all of the mandatory elements, *subject to the judicial enforcement mechanisms of Article 14*. (§ 65700, subd. (a).) We accept this reading of section 65700, which we believe is the more sensible construction of the statute when read in context with Article 14. (See *Skidgel, supra*, 12

---

[12]    Indeed, many of the directives set forth in Article 14 are specifically directed to the courts and referees overseeing the legal enforcement actions (see §§ 65751, 65752, 65753, subd. (a), 65754.5, 65755, 65756, 65757, 65759, subd. (b), 65760, 65761) and the parties asserting such actions (see § 65753, subd. (b))—not the cities whose general plans and elements have been challenged.

Cal.5th at p. 14 ["we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes"].)

As noted, several statutory provisions within Article 14 broadly state, without exception, that they apply to *any* legal action challenging the general plan or mandatory element of *any* city. (§§ 65751, 65754.) However, if we were to adopt the City's interpretation of section 65700, these Article 14 provisions would only apply to *some* legal actions challenging the general plans and elements thereof for *some* cities (general law cities). The City makes no effort to harmonize its construction of section 65700 with the expansive and unqualified language the Legislature adopted in Article 14.

Moreover, as discussed, section 65754 expressly presupposes that a judgment may be issued under Article 14 against charter cities insofar as it requires "chartered cities" to bring their zoning ordinances into consistency with their general plans within 120 days after they have amended their general plans to comply with Article 5. (§ 65754, subd. (b).) Once again, the City makes no attempt to reconcile this statutory language with its claim that charter cities are exempt from Article 14 in its entirety.

"Where a statute is subject to two or more reasonable interpretations, the interpretation which will harmonize rather than conflict with other provisions should be adopted." (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 286; see *Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 154 ["We interpret the words in the context of related statutes, harmonizing them whenever possible."].) Applying that principle of statutory construction here, we adopt the Petitioners' proposed interpretation of section 65700, under which charter cities must adopt general plans with all of the mandatory elements required

26

by Article 5, subject to the judicial enforcement procedures and remedies of Article 14. (See § 65700, subd. (a).)

We are not the first court to invoke this principle of statutory construction to conclude that a statutory provision contained within Chapter 3 of Title 7 is applicable to charter cities, even though section 65700 does not expressly state that it applies to charter cities. In *Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 304 (*Garat*), disapproved on other grounds by *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11, the court resolved the question of whether a charter city's general plan must be internally consistent in order to be valid. Three statutes were pertinent to answering this question: (1) section 65700; (2) section 65300, which requires charter cities to "adopt general plans which contain the mandatory elements specified in Section 65302," and (3) section 65300.5, the statute requiring internal consistency in a general plan.[13]

Despite the fact that the version of section 65700 in effect at the time did not explicitly state that charter cities were subject to section 65300.5, the *Garat* court concluded that 65300 and 65700, subdivision (a), construed together, "require[d] that charter cities adopt a general plan in which [the] 'mandatory elements,' *as construed under section 65300.5*, are internally consistent with each other[.]" (*Garat, supra*, 2 Cal.App.4th at p. 286.) The court invoked "the basic principle of statutory interpretation that 'wherever possible, a statute must be harmonized with other statutes contained in the legislative scheme,' " and observed that "[s]ection 65700, subdivision (a), requires that a charter city's general plan contain 'the mandatory elements

---

[13]  Section 65300.5, subdivision (a) states, "In construing the provisions of [Article 5], the Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency."

27

required by Article 5'—not just those mandatory elements required by section 65302." (*Garat,* at pp. 286–287.) According to the *Garat* court, this "broad-reaching language" indicated "that the 'mandatory elements' of section 65302 are to be understood and construed as being qualified by the other applicable provisions of article 5, such as the 'internal consistency' provision of section 65300.5," which, "by itself, is a legislative directive as to how [courts] are to understand and construe section 65302." (*Ibid*.) Thus, "the 'mandatory elements' of section 65302 must be understood as being 'internally consistent mandatory elements.' " (*Ibid*.)

Like the *Garat* court, we construe section 65700 to harmonize it with other statutory provisions—in this case, the statutory provisions contained within Article 14. As discussed, those provisions provide judicial enforcement mechanisms and remedies that apply in "any action brought to challenge the validity of the general plan of any city," and they expressly presuppose that a judgment may be entered against charter cities under Article 14. (§ 65754, subds. (a), (b).) Reading all of these provisions together, we conclude that Article 14 applies to legal actions against charter cities and section 65700 requires charter cities to "adopt general plans … [that] contain the mandatory elements required by Article 5," subject to the judicial procedures and remedies outlined in Article 14. (§ 65700, subd. (a).)

We also note the Petitioners' reading of section 65700 avoids the unreasonable results that could flow from the City's reading of section 65700. As we noted at the outset of our opinion, the Legislature has found that "[t]he availability of housing is of vital statewide importance," and "[l]ocal and state governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community."

28

(§ 65580, subds. (a), (d).)  The need to promote housing for all economic segments of society is particularly acute because, as the Legislature has recognized, our state is suffering from "a housing supply and affordability crisis of historic proportions" that has harmed millions of Californians. (§ 65589.5, subd. (a)(2)(A); see also § 65913, subd. (a) ["The Legislature finds and declares that there exists a severe shortage of affordable housing, especially for persons and families of low and moderate income"].)

The legislative history of Assembly Bill No. 1612 (Stats. 1982, ch. 27, § 2), the bill that enacted Article 14, reveals that Article 14 was intended to put teeth to the requirement that cities must adopt a general plan with a housing element—all in pursuit of the goal of ensuring a sufficient housing supply statewide.  According to a bill analysis prepared for the Assembly Judiciary Committee, bill supporters "claim[ed] that it [was] necessary to ensure that meritorious actions challenging the validity of general plans [were] ultimately effective.  It [was] also intended to deter actions filed in the hope of achieving indefinite delay," which could "drag on for several years," and to avoid the "uncertainty [that] often [arose] as to what the court [would] do once a defective element in the general plan is found."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1612 (1981–1982 Reg. Sess.), as amended Apr. 27, 1981, p. 3; see former § 65750 [Article 14 "provide[s] [a] method[ ] to expedite judicial review of challenges to a general plan"].)

It would be anomalous for the Legislature to impose a statutory mandate on both general law and charter cities to adopt general plans with compliant housing elements—with the expressed aim of solving an urgent housing crisis—while exempting charter cities from Article 14, which sets out the remedies that most expeditiously and effectively rectify a city's failure to adopt a general plan with a compliant housing element.  Indeed, if charter

cities were exempt from Article 14, they could engage in dilatory litigation tactics to avoid compliance with their duty to adopt a general plan with a compliant housing element—largely without immediate repercussions.[14]  In our view, that framework would produce illogical results.  " 'Where more than one statutory construction is arguably possible, our "policy has long been to favor the construction that leads to the more reasonable result." ' "  (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 372.)

No prior appellate decision has directly addressed whether Article 14 applies to legal actions against charter cities, but Division 2 of this court has opined, albeit in dicta, that it does.  In *Garat*, the court reversed a finding that a charter city's general plan was invalid, but observed that Article 14 would have supplied the "appropriate statutory remedy" if the general plan had been invalid.  (*Garat, supra*, 2 Cal.App.4th at pp. 302–303.)  The court conceded there may be other "remedies by which to address a found inadequacy of a general plan."  (*Id*. at p. 304.)  But it was "persuaded … the extensive and integrated nature of the legislative scheme in Article 14 evinces a legislative intent that the provision of that article serve as the *primary* judicial remedy by which to address such shortcomings."  (*Ibid*.; see also *The Kennedy Com. v. City of Huntington Beach* (2017) 16 Cal.App.5th 841, 859 ["according to [Article 14], [the] City [of Huntington Beach] should have been granted time to amend its housing element" if its adoption of a specific plan had caused its housing element to violate state law]; *Denham, LLC v. City of Richmond* (2019) 41 Cal.App.5th 340, 353–356 ["the

---

14    Although the Attorney General may seek to recover fines against a jurisdiction that has failed to comply with a court order or judgment compelling substantial compliance with the requirements of Article 5, the court cannot impose fines until at least one full year has passed since the court issued its order or judgment.  (§ 65585, subd. (*l*)(i).)

legislatively prescribed remedy of section 65754" was appropriate where a voter initiative created inconsistencies with a charter city's general plan].) We agree with the *Garat* court's observation. (See *Masry v. Masry* (2008) 166 Cal.App.4th 738, 741 ["Dicta may not decide a case but can be persuasive and influence later cases."].)

For all these reasons, we conclude that Article 14 applies to legal actions against charter cities. We reject the City's claim that section 65700 exempts such actions from Article 14, and construe that statute as requiring charter cities to adopt general plans containing the mandatory elements required by Article 5, subject to the judicial enforcement procedures and remedies of Article 14. Because Article 14 applies to legal actions against charter cities, we conclude the trial court erred when it omitted the 120-day compliance deadline (§ 65754, subd. (a)), and one or more provisional remedies (§ 65755, subd. (a)), from the June 20 Order.

### 2. *Section 65009.1*

A recent legislative enactment bolsters our determination that Article 14 applies to actions against charter cities. During the pendency of this case, the Legislature enacted Senate Bill No. 1037 (Stats. 2024, ch. 293, § 2), which added section 65009.1 to the Government Code, effective January 1, 2025.[15]

Section 65009.1, subdivision (e)(2), provides, "The remedies in Article 14 (commencing with Section 65750) of Chapter 3 apply to actions against all cities, including charter cities, to enforce the requirements of

---

[15] We grant the City's request for judicial notice of select legislative history materials for Senate Bill No. 1037. (Evid. Code, § 452, subds. (b), (c).) We deny the City's request for judicial notice of select legislative history materials for an unrelated bill, Senate Bill No. 1333 (2017–2018 Reg. Sess.), as those materials are irrelevant to the disposition of the appeal.

31

Section 65585 as a mandatory element of a general plan under Article 5 (commencing with Section 65300) of Chapter 3. *This paragraph is declaratory of existing law*." (§ 65009.1, subd. (e)(2), italics added.)

According to the Petitioners, section 65009.1, subdivision (e)(2), clarifies that Article 14 applied to legal actions against charter cities prior to the enactment of section 65009.1, and it continues to apply to such actions afterwards. Alternatively, they claim section 65009.1 governs this action, regardless of whether it clarified or changed the law, because the City still has not adopted a compliant sixth cycle housing element and the new law operates prospectively to cure these ongoing violations of state law. We agree with the Petitioners' first argument, rendering it unnecessary for us to address the second argument.

" '[T]he interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts.' [Citation.] When [the Supreme] [C]ourt 'finally and definitively' interprets a statute, the Legislature does not have the power to then state that a later amendment merely declared existing law. [Citation.] [¶] However, 'if the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration.' " (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922; see *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 ["the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them"]; *Goldstein v. Superior Court* (2023) 93 Cal.App.5th 736, 748 (*Goldstein*) [" 'The Legislature's declaration of an existing statute's meaning, while not dispositive, is a factor entitled to consideration."].) The underlying rationale for this rule of law "is that, as to unsettled questions concerning

32

rules of decision and absent a good reason to the contrary, the Legislature's subsequent resolution should receive deference." (*City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 798.)

"One circumstance indicating the Legislature intended to clarify an existing statute rather than to change the law ' "is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation[.]" [Citation.] " ' "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. ... [¶] If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act ...." ' " ' [Citation.] Viewing a new statutory enactment as an attempt to clarify the meaning of an existing statute is especially warranted when, as here, the meaning of relevant language in the existing statute is plainly ambiguous." (*Goldstein, supra*, 93 Cal.App.5th at pp. 748–749.)

Here, there has been no final and definitive judicial interpretation of whether Article 14 applies to enforcement actions against charter cities. Thus, the Legislature was free to articulate its considered view that, under existing law, Article 14 applied to such actions. Further, the Legislature enacted section 65009.1, subdivision (e)(2), at least in part, in response to the ongoing controversy concerning the City's refusal to adopt a housing element

33

revision.[16]  Because there has never been a final and definitive judicial interpretation of whether Article 14 applies to actions against charter cities, we give due consideration to our Legislature's expression that it *does* apply to them.  Our deference to the Legislature's stance—in combination with the text of Article 14, the legislative policies underpinning Article 14, and past judicial precedent—convince us that Article 14 applied to legal actions against charter cities before section 65009.1 went into effect, and that it continues to do so afterwards.

The City argues section 65009.1, subdivision (e), is inapposite to the present case because Senate Bill No. 1037, the enacting legislation, does not contain an urgency clause or an express statement that section 65009.1, subdivision (e)(2), applies retroactively.  We reject this argument.  "If [an] amendment merely clarifie[s] existing law, no question of retroactivity is presented.  '[A] statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment' 'because the true meaning of the statute remains the same.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471; *Department of Finance v. Commission on State Mandates* (2022) 85 Cal.App.5th 535, 573 ["a statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment"].)  As discussed above, section 65009.1, subdivision (e), *clarified* that Article 14 applies to legal actions against

_____

[16]   A Senate Judiciary Committee report on Senate Bill No. 1037 noted that "the Attorney General and HCD [had] sued Huntington Beach for failure to adopt a housing plan compliant with state law," and observed that the bill bolstered the Attorney General's power to enforce state housing laws against municipalities that violated those laws.  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1037 (2023–2024 Reg. Sess.) as amended Apr. 23, 2024, pp. 5–6.)

charter cities; it did not *change* the law.  Thus, no question of retroactivity is presented.

The City also claims that section 65009.1, subdivision (e)(2), impinges upon the City's home rule authority.[17]  "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs.  Article XI, section 5, subdivision (a) of the California Constitution provides: 'It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations *in respect to municipal affairs*, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.  City charters adopted pursuant to this Constitution shall supersede any existing charter, and *with respect to municipal affairs* shall supersede all laws inconsistent therewith.' " (*City of Vista, supra*, 54 Cal.4th at p. 555.)

"Home rule authority under article XI, section 5 of the California Constitution does not mean charter cities can never be subject to state laws that concern or regulate municipal affairs.  '[A] charter city's authority to enact legislation is not unlimited.' [Citation.]  The Legislature may legislate as to matters of statewide concern and, if the statute is not overbroad, then the conflicting charter city law 'ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.' [Citation]

_____

[17]   The City purports to challenge section 65009.1 in its entirety.  However, the City only presents arguments relating to subdivision (e)(2), without addressing the statute's other subdivisions.  Moreover, the City admits subdivision (e)(2), is "the only part of [Senate Bill No.] 1037 relevant here."  Therefore, we construe the City's home rule challenge as an attack against section 65009.1, subdivision (e)(2), only.

' "[G]eneral law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern." ' " (*City of Huntington Beach, supra*, 44 Cal.App.5th at pp. 254–255.)

We apply "a four-part 'analytical framework' to determine whether a state law unconstitutionally infringes the home rule authority of charter cities granted by article XI, section 5 of the California Constitution. [Citations.] First, the court determines whether the local law at issue regulates an activity that can be characterized as a municipal affair. [Citations.] Second, the court determines whether there is an actual conflict between state law and the local law. [Citations.] If no conflict exists, the analysis is complete and there is no need to go to the next step. [Citation.] Third, the court decides whether the state law addresses a matter of ' "statewide concern." ' [Citations.] Fourth and finally, the court determines whether the state law is ' "reasonably related to ... resolution" ' of the identified statewide concern and is ' "narrowly tailored" to avoid unnecessary interference in local governance.' " (*City of Huntington Beach, supra*, 44 Cal.App.5th at p. 255.)

In their appellate briefs, the parties concede the first three areas of inquiry are satisfied.[18] Thus, we will assume for purposes of the appeal, without deciding, that the City has regulated a municipal affair, an actual conflict exists between state law and local law, and section 65009.1, subdivision (e)(2), addresses a matter of statewide concern. Proceeding to the

---

[18] The Petitioners admit the first three "prongs are easily answered in the affirmative," and proceed to analyze only the fourth requirement. The City, for its part, admits the legislative goal of ensuring the supply and affordability of "housing is a statewide concern."

36

fourth area of inquiry, we conclude section 65009.1, subdivision (e)(2), does not infringe on the City's home rule authority because the state law is reasonably related to the resolution of a statewide concern and narrowly tailored to avoid unnecessary interference with local governance.

There cannot be any reasonable dispute—and in fact there is no dispute between the parties—that section 65009.1, subdivision (e)(2), reasonably relates to the resolution of the state's interest in promoting the supply and affordability of housing statewide.  By clarifying that Article 14 applies to actions against charter cities, section 65009.1, subdivision (e)(2), ensures that actions challenging a charter city's noncompliance with Article 5, including its duty to adopt a housing element satisfying the Housing Element Law (§§ 65300, 65302, subd. (c)), are heard expeditiously.  (§§ 65752–65753.)  Further, it incentivizes a noncompliant charter city to bring its housing element swiftly and fully into compliance, both by mandating compliance within 120 days (§ 65754), and setting forth applicable remedies until the city rectifies the deficiencies in its housing element (§ 65755, subd. (a)).  Compliant housing elements, in turn, obviously advance the state's goal of facilitating and promoting housing for all segments of society.  (See § 65580, subd. (f) ["Designating and maintaining a supply of land and adequate sites suitable, feasible, and available for the development of housing sufficient to meet the locality's housing need for all income levels is essential to achieving the state's housing goals"]; *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 445 [observing that the Housing Element Law is intended to "facilitate and encourage the provision of affordable housing"].)

Section 65009.1, subdivision (e)(2), is also appropriately tailored to avoid unnecessary interference with the local governance of the City.  Section 65009.1, subdivision (e)(2), merely clarifies existing state law, which

37

applies Article 14 to actions against charter cities. (§ 65009.1, subd. (a)(2).) As we have discussed, Article 14 sets forth procedural rules designed to accelerate legal challenges when a city is charged with having a noncompliant general plan or mandatory element—hardly an undue or oppressive intrusion into local governance. (§§ 65752–65753.) And, if a court finds the city to have a noncompliant general plan or mandatory element, Article 14 sets forth a reasonable deadline of 120 days for the city to bring its general plan or element into compliance. (§ 65754.) Article 14 does not dictate *how* the city must bring its general plan or mandatory element into compliance.

Article 14 also requires courts to impose provisional remedies that do, of course, limit cities' authority over permitting, zoning, and subdivision approvals. However, those remedies are limited in duration. They may be imposed only after a court has found that the city's general plan or mandatory element does not substantially comply with the requirements of Article 5, and they remain in effect only until the city "has substantially complied with the requirements of Article 5." (§ 65755, subd. (a).)

The provisional remedies are also crucial to cure a city's violations and effectuate the state's housing laws. As one court recently observed, "local governments are susceptible to 'not in my backyard' (or NIMBY) pressure: Local residents do not want to live near high-density housing, so they elect local officials hostile to such housing or lobby heavily against such housing, figuring that *some other local government* will approve higher-density projects …. [B]ecause local governments would not address the housing shortage if left to their own devices, state intervention is sensible—if not outright necessary." (*AIDS Healthcare Foundation v. Bonta* (2024) 101 Cal.App.5th 73, 85.) The same logic applies here. Cities that have breached

the state's housing laws surely must be incentivized to correct their violations. Article 14 provides those sensible and necessary incentives.

### 3. Conclusion

The statutory text and legislative objectives of Article 14, past judicial decisions, and newly enacted section 65009.1, subdivision (e)(2), confirm that Article 14 applies to actions against charter cities. Because Article 14 applies to such actions, the trial court erred by omitting the 120-day compliance deadline and one or more provisional remedies from the June 20 Order granting the first cause of action in the State's amended petition for writ of mandate. In light of this error, we grant the Petitioners' request for a peremptory writ vacating, in part, the June 20 Order, and instruct the trial court to enter a new order that satisfies sections 65754 and 65755.[19]

### B. The Trial Court Must Lift the Automatic Stay and Expeditiously Adjudicate the Cross-Petition and Petition in Intervention

The Petitioners also ask that we include in our peremptory writ of mandate an instruction that the trial court vacate its October 15 Order. In that order, the trial court declined to enter a final judgment due to the pendency of the Kennedy Commission's unadjudicated petition in intervention and the City's unresolved cross-petition. The court also reimposed its earlier stay—effectively freezing the case in place—which it had imposed due to the parties' appeals of the June 20 Order. We address these aspects of the October 15 Order in reverse order.

---

[19] Our opinion today should not be misconstrued as a determination about whether the trial court correctly granted the first cause of action in the State's amended petition for writ of mandate, nor is it meant to foreclose future appellate arguments pertaining to that issue. The parties may present such arguments should they choose to appeal the ensuing final judgment.

### 1. *The Automatic Stay Is No Longer Applicable*

Subject to exceptions not relevant here, "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) "The purpose of the automatic stay provision of section 916, subdivision (a) 'is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided.'" (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189.)

Here, the trial court stayed all proceedings before it under the automatic stay provision, which the court reimposed in the October 15 Order. The court stayed the proceedings because the parties appealed the June 20 Order, which is the subject of Case No. D084749. However, concurrently with the filing of this opinion, we are filing an order dismissing Case No. D084749 as moot based on our disposition in these proceedings. Thus, there is no longer an appeal justifying the imposition of an automatic stay.[20]

In the absence of an extant appeal from the June 20 Order, we order the trial court to vacate the portion of its October 15 Order staying the proceedings before it.

### 2. *We Decline the Petitioners' Request to Order the Dismissal of the Cross-Petition and the Entry of a Final Judgment for the State*

Finally, we turn to the Petitioners' request that we instruct the trial court to vacate the portion of its October 15 Order declining to enter a final judgment for the State. The City opposes the Petitioners' request, arguing

---

[20] We grant the City's request for judicial notice of our court records from the direct appeal, *The People of California ex rel. Rob Bonta et al. v. City of Huntington Beach et al.*, Case No. D084749. (Evid. Code, § 452, subd. (d).)

40

that a final judgment cannot be entered because the trial court has not yet adjudicated the City's cross-petition against the State.

" 'Where a complaint and cross-complaint involving the same parties have been filed, there is no final, appealable judgment *until both have been resolved*. [Citation.]' [Citation.] 'Judgment rendered on a complaint alone, unaccompanied by judgment on a pending cross-complaint, is not a final judgment …. [Citations.]' [Citations.] [¶] Thus, a judgment which resolves a complaint but does not resolve a cross-complaint pending between the same parties, is not final and not appealable, even if the complaint has been fully adjudicated." (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 132; see *American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 557 ["When a cross-complaint remains pending between the parties, even though the complaint has been fully adjudicated, there is no final judgment."].) Based on the pendency of the cross-petition, we decline to direct the entry of a final judgment for the State.

Recognizing that the City's cross-petition poses an obstacle to the entry of a final judgment, the Petitioners urge us to direct the trial court to summarily dismiss the cross-petition. Relying on *American Nat. Bank v. Stanfill* (1988) 205 Cal.App.3d 1089 (*Stanfill*), they argue we should order the dismissal of the cross-petition because the trial court "already resolved the substantive legal issues raised in the Cross-Petition" when it granted the first cause of action in the State's amended petition for writ of mandate.[21]

---

[21] In particular, the Petitioners claim the trial court already found the City failed to adopt a compliant housing element revision, Article 14 applies to legal actions against charter cities (notwithstanding the court's failure to include Article 14 remedies in the June 20 Order), the State satisfied its duty to provide the City an opportunity for two meetings concerning its failure to adopt a revised housing element, and the City's obligations under CEQA do not excuse its failure to adopt a revised housing element.

41

Alternatively, they argue we should order the dismissal of the cross-petition because it seeks improper relief based on unsound legal theories.

We decline the Petitioners' request to order the summary dismissal of the City's cross-petition. As an initial matter, this case is distinguishable from *Stanfill*, the decision on which the Petitioners base their dismissal request. In that case, a bank sued two individuals to enforce their obligations under a promissory note and the individuals cross-complained against the bank. (*Stanfill, supra*, 205 Cal.App.3d at p. 1093.) After the trial court granted summary judgment for the bank, the court entered a so-called final judgment for the bank without ruling on the cross-complaints. (*Id.* at p. 1094.) On appeal, the *Stanfill* court determined the judgment was not final due to the unadjudicated cross-complaints, which raised "identical issues" to those raised in the individuals' affirmative defenses to the complaint. (*Id.* at pp. 1094–1096.) However, to ensure the appealability of the judgment, the court amended the judgment to specify that the individuals were entitled to no relief against the bank as prayed for in the cross-complaints. (*Id.* at p. 1096.) The court then determined the as-modified judgment was appealable, held that triable issues of material fact precluded summary judgment, and reversed the as-modified judgment. (*Id.* at p. 1096.)

*Stanfill* is inapposite to the present case. In *Stanfill*, the court amended a so-called judgment to encompass all of the actual determinations made by the trial court for the purpose of preserving the appealability of the judgment. Here, the Petitioners do not seek to preserve the appealability of any order or judgment. Rather, they request a summary dismissal of the cross-petition solely for the purpose of expediting the resolution of the case. Further, the *Stanfill* court reversed the as-modified judgment and returned the case to the trial court for further proceedings on the complaint and,

42

presumably, the cross-complaints.  By contrast, if we were to grant the Petitioners' request for dismissal of the cross-petition, there would be no further proceedings concerning the cross-petition.  Instead, the dismissal would halt any further consideration of the cross-petition by the trial court. We are aware of no authority permitting us to order such relief.

Irrespective of whether we possess the authority to order the dismissal of the cross-petition in the first instance, we are disinclined to do so here. "The trial court is the proper forum in which to address in the first instance matters related to the pleadings, and whether an amendment should be allowed prior to entry of judgment …." (*Balloon v. Superior Court* (1995) 39 Cal.App.4th 1116, 1122, abrogated by statute on other grounds as stated in *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 110.)  The Petitioners have filed a demurrer and an anti-SLAPP motion targeting the cross-petition, both of which are awaiting resolution.  We have every confidence the trial court will rule on these filings swiftly.  However, to assuage any possible doubts on the matter, we instruct the trial court to resolve these filings expeditiously and afford this enforcement proceeding the calendar preference to which it is entitled under section 65752.

## IV

## DISPOSITION

Let a writ of mandate issue directing the superior court to:

1. Vacate the portion of its June 20, 2024 order granting the first cause of action of the first amended petition for writ of mandate and complaint for declaratory and injunctive relief filed by the People of California and the California Department of Housing and Community Development, and enter a new order that satisfies the requirements of

43

Government Code sections 65754 and 65755, and otherwise comports with the opinions expressed herein;

2. Vacate the portion of its October 15, 2024 order staying all superior court proceedings; and

3. Expeditiously adjudicate: (a) the petition in intervention filed by intervenor Kennedy Commission; and (b) the amended cross-petition for writ of mandate and complaint filed by the City of Huntington Beach, the City Council of Huntington Beach, and Al Zelinka, in his official capacity as City Manager of Huntington Beach.

Petitioners are entitled to their costs in these consolidated writ proceedings.

McCONNELL, P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.